CAL J. POTTER, III, ESQ.
Nevada Bar No. 1988
POTTER LAW OFFICES
1125 Shadow Lane
Las Vegas, NV 89102
Ph:  (702) 385-1954
Fax: (702) 385-9081
cpotter@potterlawoffices.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

FERENCE FARKAS,

    Plaintiff,

v.

STATE OF NEVADA DEPARTMENT OF CORRECTIONS, as nominal Defendants;
DR. ARANAS; DR. KAREN GEDNEY;
DOE MEDICAL DOCTOR I, and
DOE DEFENDANTS I-X

    Defendants.
_____/

**COMPLAINT AND JURY DEMAND**
**(Injunctive Relief and Money Damages)**

    COMES NOW Plaintiff, FERENCE FARKAS, an inmate with the Nevada Department of Corrections, by and through his counsel, CAL J. POTTER, III, ESQ. of POTTER LAW OFFICES, hereby allege, complain and aver against Defendants, and each of them, as follows:

**JURISDICTION**

    1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 in that claims herein arise under the federal civil rights statutes, and pursuant to 28 U.S.C. § 1331, in that federal questions exist. Supplemental jurisdiction exists over state law claims pursuant to 28 U.S.C. § 1331. Venue is proper in this district and in this, the unofficial southern division of this district, because Mr. Farkas is housed at High Desert State Prison.

. . .

. . .

## NATURE OF CASE

2. This is an action for injunctive relief compelling medical treatment for a severe chemical burn and the failure to treat the serious bodily injury as well as for monetary damages and for attorney's fees and costs brought by Plaintiff Ference Farkas. Mr. Farkas alleges that the defendants, and each of them, being in violation of the First, Eighth and Fourteenth Amendments to the Constitution and laws of the United States of America, unlawfully and under color of authority, violated the plaintiff's rights by failure to provide adequate medical treatment to Mr. Farkas and have transferred him from Northern Nevada Correctional Center (the Regional Medical Center) to High Desert State Prison.

Mr. Farkas has exhausted his claims pursuant to PLRA.

The acts committed against Mr. Farkas:

a.  Violated the First, Eighth and Fourteenth Amendments to the Constitution and laws of the United States of America;

b.  Were tortious under the laws of the State of Nevada and the common law.

Claims are stated for violation of the civil rights of the Plaintiff, for failure to provide necessary medical treatment to Mr. Farkas for inflicting cruel and unusual punishment upon Plaintiff and for the infliction of intentional emotional distress on the Plaintiff.

## PARTIES

3. Plaintiff Ference Farkas ("Mr. Farkas" or "Plaintiff") is an inmate under sentence and in the care and custody of the Nevada Department of Corrections. Mr. Farkas has serious medical needs resulting from chemical burns from oven cleaner that was spilled on his groin area.

4. Defendant, Dr. Aranas is sued herein as an individual in his official capacity as the Medical Director for the Nevada Department of Corrections, and he is and at all time relevant and to our knowledge a resident of the State of Nevada. He has personally acted as a treater of Mr. Farkas.

5. Defendant, Dr. Karen Gedney ("Dr. Gedney") is sued herein as an individual in her official capacity as the Medical Doctor at Northern Nevada Correctional Center, and she is

and at all times relevant and to our knowledge a resident of the State of Nevada. In doing the acts alleged herein, she acted individually and as the Medical Doctor at Northern Nevada Correctional Center in the State of Nevada, under color of state law.

6. Doe Medical Doctor I is sued herein as an individual in their official capacity as a Medical Doctor with the Nevada Department of Corrections and at all times relevant and to our knowledge a resident of the State of Nevada. In doing the acts alleged herein, Doe Medical Doctor I acted individually and as a Medical Doctor with the Nevada Department of Corrections, under color of state law.

7. Defendant State of Nevada Department of Corrections ("NDOC"), is a duly constituted political subdivision of the State of Nevada and the employer of Northern Nevada Correctional Center ("NNCC"), whose acts were all done pursuant to custom and policy of Defendant NDOC.

8. Plaintiff does not know the true names and capacities or involvement, whether individual, corporate, associate, partnership or otherwise of the Defendants named herein as JOHN DOES I through XX, inclusive and ROE CORPORATIONS I through XX, inclusive. Plaintiff is informed and believe, and upon such information and belief alleges, that each of the Defendants designated herein as DOE and ROE is negligently or otherwise legally responsible in some manner for the events and happenings referred to herein, and that each negligently or otherwise caused injury or damages proximately suffered by the Plaintiffs, as more particularly alleged herein. Plaintiffs pray leave to amend this Complaint to show their true names and capacities when the same have been finally determined.

9. At all times pertinent hereto, the named Defendants herein were acting by and through its authorized employees, agents or other representatives, who were operating within the course and scope of their representative capacity, and whose conduct has been ratified by each said Defendant.

10. At all times pertinent hereto, the named Defendants were operating by, through and in consort with other individuals, partnerships and/or corporations yet to be named in this action, and was acting in furtherance of a civil conspiracy with said unnamed individuals,

partnerships and/or corporations.

**FACTS OF THE CASE**

A.  FACTS SURROUNDING MR. FARKAS' INJURY

11. Mr. Farkas is an inmate at Northern Nevada Correctional Center ("NNCC"). In April 2013, Mr. Farkas was assigned to work in the culinary unit and kitchen facility (which is also called the "clipper room") at NNCC. Prior to working in the culinary unit at NNCC Mr. Farkas had no training. He was not informed of any safety rules, standards, policies, procedures or protocols, especially when handling caustic chemicals.

12. During his time in the clipper room Mr. Farkas noticed NNCC was short one (1) plastic apron. The only extra, available, apron had broken straps and was too small for Mr. Farkas.

13. On or about May 11, 2013, Mr. Farkas spilled caustic oven cleaner on the front of his pants while working in the kitchen facility NNCC. The oven cleaner soaked through Mr. Farkas' clothing. Mr. Farkas reported the spill to Correctional Officer Riggins, who was deliberately indifferent to a hazamtic emergency and denied Mr. Farkas any emergent care. Instead, Mr. Farkas was forced to finish his work shift and shower that night.

14. On or about May 14, 2013, the skin on Mr. Farkas' penis began to peel.

15. On or about May 15, 2013, Mr. Farkas applied medicated skin cream to the injured area.

16. On or about May 19, 2013, Mr. Farkas tried to transfer out of the kitchen cleaning room but Correctional Officer Columbus, refused to transfer Mr. Farkas out of the wet and humid clipper room where his wound continued to burn and itch.

17. On or about May 20, 2013, the injured areas on Mr. Farkas' penis became raw, open wounds oozing yellowish pus and discharge. The burns had eaten down to the tissue of Mr. Farkas' penis, leaving gouges in several places throughout the shaft of the penis, which were painful in nature.

18. On or about May 27, 2013, Mr. Farkas called, "man down" because his wounds were causing him extreme pain. Eventually, Dr. Gedney treated Mr. Farkas for second degree

chemical burns to his penis, at which time Mr. Farkas requested to be hospitalized, but was denied. He was also denied prudent medical care for the burns and denied treatment for pain management.

19. Eventually, Mr. Farkas saw a urologist, Dr. Nixon, about the potential for surgery, but Dr. Nixon was unable to answer all of Mr. Farkas' concerns regarding the future use of his penis; Dr. Nixon said a plastic surgeon would be required as he had never done a surgery like the one Mr. Farkas required.

20. Mr. Farkas saw the plastic surgeon at Tahoe Medical and asked the same questions as Farkas had asked Dr. Nixon. The plastic surgeon similarly responded that he needed to discuss the surgery with the urologist and informed Mr. Farkas he would have the urologist contact Farkas.

21. Shortly thereafter, Dr. Gedney opined that Mr. Farkas may require skin grafts to repair the damaged penis. Dr. Gedney informed Mr. Farkas that there was scar tissue obstructing the flow of blood which was stalling and possibly preventing the healing process. Dr. Gedney felt the skin graft was inadequate because there is no other skin on the human body like the foreskin on the penis.

22. Sometime later, Nurse Candice administered papers for Mr. Farkas to consent to surgery. However, Mr. Farkas' concerns regarding the future use of his penis and/or the potential skin grafting. Dr. Gedney agreed to hold off the surgery until Mr. Farkas' further consultation with Dr. Nixon. However, Dr. Nixon never addressed Mr. Farkas' concerns, so Mr. Farkas submitted a medical kite requesting a second urological opinion.

23. Throughout this time Mr. Farkas was unable to sleep through the night due to the excruciating pain he was only able to fall asleep for short periods of time. Mr. Farkas would regularly wake-up screaming in pain.

24. On or about November 3, 2013, Mr. Farkas saw urologist, Dr. Chen, and felt he was more adequately able to perform the required surgery, so Mr. Farkas agreed to proceed and submitted a medical kite on or about November 10, 2013, which confirmed he was scheduled for surgery. Shortly before the Thanksgiving holiday, during Dr. Gedney's absence, the NNCC

Director of Nursing, Terry Jacobs, announced to Mr. Farkas that he was being sent to High Desert State Prison ("HDSP") for surgery as University Medical Center had a plastic surgeon that could perform surgery. Mr. Farkas expressed that he could not endure a 10 hour bus ride to Las Vegas, Nevada because of the ongoing pain.

25.  On or about November 15, 2013, Mr. Farkas' bowels began to bleed and his appointment with NNCC medical was cancelled. Upon arriving back at his room, Mr. Farkas changed his briefs assuming the bleeding had slowed or stopped. When he left his cell, blood started running down his legs. He immediately ran to the nearest corrections officer and asked to be taken to medical; Dr. Gedney and Dr. Johns were there along with Nurse Candice and Corrections Officer Dannis. Dr. Gedney said words to the effect of, "What do you want me to do? You fired me remember?" Mr. Farkas yelled for someone to do something, but both doctors left the medical rotunda and went in to the back of RMF, leaving Mr. Farkas, Nurse Candice, and Corrections Officer Dannis alone. Corrections Officer Dannis was shocked enough to comment that Mr. Farkas must have upset the doctors because they just walked out on him.

26.  That night Mr. Farkas bled from 5:00 p.m. to 6:00 p.m. Upon seeing Mr. Farkas' condition Corrections Officer Zenfeld called, "man down" and Nurse Candice and Corrections Officer Dannis answered the call. When they saw it was Mr. Farkas, Nurse Candice and Corrections Officer Zenfeld argued about who was going to pay for the call while Mr. Farkas pleaded for assistance.

27.  Mr. Farkas was provided ice and informed that if he bled again he would be admitted to RMF. That same evening at approximately 10:30 p.m. Mr. Farkas bled all over the floor again. On or about November 27, 2013 Mr. Farkas was admitted to the hospital and upon his return to NNCC on or about December 2, 2013, he was informed he was being transferred to HDSP.

28.  On or about December 3, 2013 Mr. Farkas arrived at HDSP and immediately collapsed from enduring hours of pain on his bus ride. The medical staff evaluated Mr. Farkas, but concluded he could enter general population.

. . .

29. Approximately, one (1) week later, Mr. Farkas saw Dr. Aranas, the Medical Director of HDSP. Dr. Aranas informed Mr. Farkas that there was a urologist willing to perform the surgery, but if a plastic surgeon could not be located, there was nothing more NDOC could do. Dr. Aranas' examination of Mr. Farkas was brief and he opined that his injury was "not that bad" even though Mr. Farkas' penis had formed in to a knot of scar tissue. Additionally, Mr. Farkas still had unhealed wounds seven and a half (7 ½) months later and still had problems urinating properly. Dr. Aranas told Mr. Farkas he would see the urologist in three (3) weeks, but as of February 2014, he still has not see the urologist.

30. On or about January 16, 2014, Mr. Farkas was seen by Doe Medical Doctor I, whom deliberately took away Mr. Farkas' medical supplies, including, but not limited to topical cream and gauzes.

31. On or about January 23, 2014 Mr. Farkas stated to Corrections Officer Badger he needed to be taken to the medical ward because his wounds were cracking, bleeding, oozing, and sticking to his briefs. Corrections Officer Badger made several calls to medical, but they did would not accept Mr. Farkas without the submittal of a kite, which he had been doing since his arrival . Mr. Farkas suggested that Corrections Officer Badger call a "man down," but medical told Corrections Officer Badger that they would only send Mr. Farkas back to his cell and charge him $80.00. Corrections Officer Badger made a comment that injuries to genitals are no joke and should be treated immediately.

32. Mr. Farkas later saw a female doctor who said she believed his penis was not only significantly swollen, but possibly infected; Mr. Farkas submitted a urine sample to test for infection. The female doctor reinstated Mr. Farkas' medical supplies after finding out that he had been injured for nearly nine (9) months.

33. Since Mr. Farkas' transfer to HDSP he has submitted several medical kites regarding period swelling of the penis and lymphatic system around the pubis area as well. Mr. Farkas' level of medical care at HDSP has been much worse than NNCC despite Mr. Farkas' submission of several kites for medical supplies.

. . .

## B.   FACTS SURROUNDING MR. FARKAS' MEDICAL CARE

34.   In early August 2013, Mr. Farkas submitted 25 emergency grievances. The first one (1) for three (3) months of lack of prudent competent medical care; the second (2) grievance was for bleeding profusely, which occurred the day after the first emergency grievance. Mr. Farkas made requests to go to the hospital, but was denied. Mr. Farkas was only told by the nurse to wrap his penis tight to stop the bleeding.

35.   During the first four (4) to five (5) months Mr. Farkas' pain was so unbearable that he did not sleep other than brief naps, from which he would wake in excruciating pain.

36.   While being examined at the prisons, Mr. Farkas requested that the only medical staff be present, but a number of corrections officers remained throughout the examinations as witnesses for the prison staff. The corrections officers who witnessed Mr. Farkas' examinations retaliated against him, specifically, Corrections Officer Vest, who made numerous derogatory sexual remarks about Mr. Farkas' injury. At one time Corrections Officer Vest told Mr. Farkas to pack his belongings because he was being transferred to RMF. Upon doing so Corrections Officer Vest then told Mr. Farkas to unpack and, "That's what you get for fucking with medical."

37.   Defendants have discussed Mr. Farkas' injury with other inmates, including, but not limited to band members and inmates on the yard, which is direct violation of Mr. Farkas' HIPAA rights.

38.   Mr. Farkas was transferred to HDSP in retaliation. He was originally classified to NNCC until his sentence expired, which was determined at the time of classification by head caseworker Moyle.

39.   Mr. Farkas never had a disciplinary problem until his medical situation. Mr. Farkas' transfer from the medical yard and NNCC to HDSP was retaliatory. NDOC and their staff are aware of Mr. Farkas' heart condition, which makes him susceptible to further medical complications due to the sever infection in his groin area.

40.   Mr. Farkas' injury is so severe that he is unable to walk long distances or exercise in an manner without experiencing pain. As such, Mr. Farkas has gained 34 pounds.

41. Mr. Farkas has been denied a comprehensive plan to treat the infection associated with the chemical burn.

42. Plaintiff is informed and does believe that given the profound and unmistakable smell of putrefying flesh, there can be no question that every medical provider and correctional officer in the treatment center and general population were acutely aware of Mr. Farkas' medical condition.

43. Plaintiff is informed and does believe that Dr. Gedney has stated that Mr. Farkas refused surgery, but Mr. Farkas has never refused surgery and has never signed any NDOC forms refusing surgery.

44. Plaintiff is informed and does believe that subsequent to the injury Mr. Farkas by and through his mother Tanita Farkas has provided Dr. Gedney with the protocol from the University of California, Davis' burn unit on the desired procedure in dealing with a chemical burn that is a third degree burns.

45. Plaintiff is informed and does believe that Dr. Gedney has refused to refer Mr. Farkas to a specialist for medical treatment for skin grafts by a urologist and a plastic surgeon.

46. On or about February 18, 2014, Mr. Farkas' cell was randomly searched in retaliation of his ongoing requests for medical treatment. Mr. Farkas was told by Corrections Officer Alvarez that the cell search was a warning.

C. **FACTS SURROUNDING MR. FARKAS' ATTEMPTS FOR OUTSIDE ASSISTANCE**

47. While Mr. Farkas was being denied medical care, he sent a letter to Congressman Joe Heck's office requesting intervention. Mr. Heck's office returned forms for Mr. Farkas to complete, which Mr. Farkas filled out and sent back.

48. During the following weeks, Director of Nursing, Terry Jacobs, asked Mr. Farkas to sign a release for medical records to Congressman Joe Heck, the Board of Medical Examiners, and his family. Mr. Farkas does not believe any of the medical releases were returned and/or received by the requesting parties.

. . .

. . .

9

49. Eventually, Mr. Farkas received correspondence from the Board of Medical Examiners stating that did not have jurisdiction to intervene, which is a similar response he received from Congressman Joe Heck's office.

50. Upon seeing Terry Jacobs again Mr. Farkas asked why, after months, his family has still not received his medical records; he also requested information about whether his file had been sent to Congressman Joe Heck's office. Ms. Jacobs responded, "I talked to Joe Heck's office. Were you very close friends? He knows of your medical situation." or words to that effect. However, Ms. Jacobs never directly confirmed whether Mr. Farkas' file had been sent to the requesting parties.

## FIRST CLAIM FOR RELIEF

## (Violation of 42 U.S.C.A. § 1983)

## (Deliberate Indifference to Serious Medical Need)

51. Paragraphs 1 through 50 herein are hereby incorporated by reference as though they set forth fully here.

52. Defendants, and each of them, were deliberately indifferent to Mr. Farkas' constitutional rights by failing to provide proper care by staff members for necessary medical needs for Mr. Farkas.

53. Defendants, and each of them, deliberately ignored Mr. Farkas' serious and life-threatening medical needs.

54. The Eighth Amendment guarantees adequate medical care for inmates.

55. Defendants, and each of them, through their deliberate indifference and failure to provide adequate medical care, denied Mr. Farkas the minimal civilized measure of life's necessities resulting in his damages.

56. Defendant's deliberate indifference and failure to provide adequate medical care subjected Mr. Farkas to cruel and unusual punishment in violation of the Eighth Amendment.

57. As a direct and proximate result of the Defendants' deliberate indifference, Mr. Farkas has suffered serious pain and injuries and is entitled to compensation for the aforementioned damages, and the Defendants, and each of them, have subjected themselves to

liability for those damages pursuant to the common law and the statutory law of the State of Nevada.

58. As a direct and proximate result of Defendant's actions and inactions toward Mr. Farkas, Defendants are liable in an amount to be more fully determined at trial.

## SECOND CLAIM FOR RELIEF

### (Violation of 42 U.S.C.A. § 1983)

### (Custom and Policy)

59. Mr. Farkas refers to paragraphs 1 through 58 herein and by this reference incorporates them herein as though they set forth fully here.

60. Defendants knowingly made, modified and carried out policies of the State of Nevada and its correctional department regarding the inappropriate or complete lack of medical treatment and care for Mr. Farkas.

61. At all times material hereto, Defendants pursuant to patterns, practices, policies, and/or customs, were deliberately indifferent to Mr. Farkas' medical condition and refused and failed to provide proper medical treatment.

62. Mr. Farkas followed all administrative procedures to obtain remedy for his deteriorating medical condition but all such efforts have been denied.

63. Mr. Farkas followed all medical orders and directions while in custody but his physical condition has continued to deteriorate

64. Having ignored Mr. Farkas' medical needs and having blatantly disregarded Mr. Farkas' deteriorating medical condition, all Defendants subjected themselves to liability under the provisions of 42 U.S.C. § 1983 to Mr. subjected themselves to liability under the provisions of 42 U.S.C. § 1983 to Mr.

## THIRD CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

65. Mr. Farkas refers to paragraphs 1 through 64 herein and by this reference incorporates them herein as though they set forth fully here.

66. Defendant's conduct, in being deliberately indifferent to Mr. Farkas' serious

1  medical needs, was extreme or outrageous with the intention of, or reckless disregard for,
2  causing emotional distress to Mr. Farkas.
3     67.   Mr. Farkas suffered severe or extreme emotional distress as the actual or
4  proximate result of the Defendant's conduct.

**CLAIM FOR RELIEF**

WHEREFORE, Plaintiff Ference Farkas prays to this Court for the following relief:

1. For an award of nominal damages;
2. For an award of general damages in a sum to be determined at trial;
3. For an award of special damages in a sum to be determined at trial;
   For an award of punitive damages in a sum to be determined at trial
4. For an award of reasonable attorney's fees and costs of suit; and
5. For such other and further relief as the Court deems just and proper.
6. For declaratory and injunctive relief requiring the return of Mr. Farkas' medical supplies and necessary medical treatment

**DEMAND FOR JURY TRIAL**

YOU, AND EACH OF YOU, WILL PLEASE TAKE NOTICE that Plaintiffs hereby demands a trial by jury of all the issues in the above-entitled matter.

DATED this 24th day of March 2014

By: /s/ Cal J. Potter, III, Esq.
CAL J. POTTER, III, ESQ.
Nevada Bar No. 1988
POTTER LAW OFFICES
1125 Shadow Lane
Las Vegas, NV 89102
Ph: (702) 385-1954
Fax: (702) 385-9081
cpotter@potterlawoffices.com